AO 442 (Rev. 11/11) Arrest Warrant

# 23-MJ-02750-TORRES

FILED BY ___MM___ D.C.

Apr 18, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 5:23-cr-39-GAP-PRL |
| COREY ALSTON | ) | |
| Defendant | ) | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)* **COREY ALSTON**,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☐ Complaint
☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:

Violation of 18 U.S.C. 371

Date: 04/12/2023

*Issuing officer's signature*

City and state: Ocala, Florida

ELIZABETH WARREN, Clerk, United States District Court
*Printed name and title*

### Return

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____
at *(city and state)* _____.

Date: _____

*Arresting officer's signature*

*Printed name and title*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

FILED
2023 APR 13 AM 9:23
US DISTRICT COURT
MIDDLE DISTRICT OF FL
ORLANDO FLORIDA

UNITED STATES OF AMERICA

v.

CASE NO. 5:23-cr-39-GAP-PRL
18 U.S.C. § 371

LATRESIA WILSON and
COREY ALSTON

# INDICTMENT

The Grand Jury charges:

## COUNT ONE

**(Conspiracy to Defraud the United States and to Purchase, Sell, and Distribute Medicare Beneficiary Identification Numbers)**

### A. Introduction

At all times material to this Indictment:

<u>The Defendants and Related Entities</u>

1. Defendant Latresia Wilson was an emergency room physician and resident of Marion County, Florida. WILSON was the sole owner and authorized representative of Latresia A. Wilson M.D., P.A. WILSON was also identified as the Chief Medical Officer of The Heritage Partners LLC (d/b/a Heritage Pharma Group) on the company's website.

2. Defendant Corey Alston was a resident of Broward County, Florida, and the Chief Administrative Officer of Heritage Pharma Group.

3.  Latresia A. Wilson M.D., P.A. was a Florida corporation and enrolled Medicare provider.

4.  Heritage Pharma Group was a Georgia Limited Liability Company.

5.  Marketing Company 1 was a Virginia company.

The Medicare Program

6.  The Medicare program ("Medicare") was a federal health care program that provided medical benefits, items, and services to beneficiaries:

    a. age 65 or older,

    b. under age 65 with certain disabilities, and

    c. of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

7.  The Centers for Medicare and Medicaid Services ("CMS") was an agency of the U.S. Department of Health and Human Services ("HHS") and was the federal governmental body responsible for the administration of Medicare.

8.  Medicare included coverage under component parts. Medicare Part A was a hospital insurance program that covered beneficiaries for, among other types of care, inpatient care in hospitals and other facilities. Medicare Part B was a medical insurance program that covered doctors' services, outpatient care, diagnostic testing, durable medical equipment, and other medical items and services not covered under Medicare Part A.

9.  Laboratories, pharmacies, physicians, nurse practitioners, and other health care providers that furnished items and services to Medicare beneficiaries were

2

referred to as Medicare "providers." To participate in Medicare, providers were required to submit a Medicare enrollment application, which required providers to certify that they would abide by Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

10. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. To receive payment from Medicare, providers submitted or caused the submission of claims to CMS that were required to set forth, among other information, the Medicare beneficiary's name and unique Medicare beneficiary identification number, the item or service provided to the beneficiary, the date the item or service was provided, and the cost of the item or service.

11. Medicare would not reimburse providers for claims for testing, items or services that were procured in violation of the Federal Anti-Kickback Statute, including the provision prohibiting the purchase, sale, and distribution of Medicare beneficiary identification numbers.

Medicare Beneficiary Identification Numbers

12. Each Medicare beneficiary was identified with a unique beneficiary identification number. These beneficiary identification numbers were used to determine a beneficiary's eligibility for Medicare benefits and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services. Health Insurance Claim Numbers ("HICNs") and Medicare Beneficiary Identifiers ("MBIs") were two types of Medicare beneficiary identification numbers.

3

13.     HICNs were typically comprised of the beneficiary's social security number and often included one or more additional letters. In 2015, Congress passed the Medicare Access and CHIP Reauthorization Act ("MACRA"), which mandated that CMS phase out the use of social security numbers in the assignment of Medicare beneficiary identification numbers.

14.     Following the passage of MACRA, CMS began to assign Medicare beneficiaries MBIs, which were comprised of a unique series of eleven randomly generated numbers and letters. MBIs, like HICNs, were used to identify qualifying beneficiaries in all Medicare transactions such as billing and claim submissions. One purpose of using this randomly generated series of numbers and letters was to improve patient identity protection and prevent identify theft. According to CMS, personal identity theft affected a large and growing number of senior citizens. CMS implemented the new MBIs in an effort to combat identity theft and safeguard taxpayer dollars.

Over-the-Counter COVID-19 Tests

15.     Starting on April 4, 2022, and continuing through the duration of the COVID-19 public health emergency, Medicare covered and paid for over-the-counter COVID-19 tests at no cost to beneficiaries with Medicare Part B and those with Medicare Advantage plans. This program was intended to ensure Medicare beneficiaries had access to COVID-19 tests they needed to stay safe and healthy during the COVID-19 pandemic. Eligible providers capable of providing ambulatory health care services were permitted to distribute to Medicare beneficiaries over-the-

4

counter COVID-19 tests that were approved, authorized, or cleared by the U. S. Food and Drug Administration.

16. Medicare would not pay for more than eight over-the-counter COVID-19 tests, per calendar month, per Medicare beneficiary. Providers could distribute over-the-counter COVID-19 tests only to Medicare beneficiaries who requested them. Providers were required to keep documentation showing a Medicare beneficiary's request for the tests.

17. Medicare did not cover over-the-counter COVID-19 tests billed by durable medical equipment suppliers or providers who distributed over-the-counter COVID-19 tests to Medicare beneficiaries during an inpatient stay at a hospital or skilled nursing facility.

### B. The Conspiracy

18. From in or around July 2022, and continuing through in or around February 2023, in the Middle District of Florida and elsewhere, the defendants,

**LATRESIA WILSON and COREY ALSTON,**

did knowingly and willfully combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to:

   a. defraud the United States out of money and property and by impeding, impairing, obstructing, and defeating the lawful function of HHS, through its agency CMS, in the administration of Medicare, by deceit, craft, and trickery; and

   b. purchase, sell, and distribute, and arrange for the purchase, sale, and distribution, of Medicare beneficiary identification numbers, that is, HICNs and MBIs, in violation of 42 U.S.C. § 1320a-7b(b)(4).

5

### C. Purpose of the Conspiracy

19. It was a purpose of the conspiracy for Latresia Wilson, Corey Alston, and others to unlawfully enrich themselves by, among other things: (a) purchasing, selling, and distributing, and arranging for the purchase, sale, and distribution, of Medicare beneficiary information, including beneficiary names, dates of birth, social security numbers, HICNs, and MBIs; (b) submitting and causing the submission of false and fraudulent claims to Medicare for over-the-counter COVID-19 tests that were not requested by beneficiaries and ineligible for Medicare reimbursement; and (c) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### D. Manner and Means

20. The manner and means by which the defendants and their co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

    a. It was part of the conspiracy that Latresia Wilson would and did own and operate Latresia A. Wilson M.D., P.A.

    b. It was further part of the conspiracy that Latresia Wilson would cause Latresia A. Wilson M.D., P.A. to become enrolled as a Medicare provider. As part of the enrollment application, Latresia Wilson falsely certified, among other things, that Latresia A. Wilson M.D., P.A. would abide by Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

6

c. It was further part of the conspiracy that Latresia Wilson did not disclose Corey Alston on the Medicare enrollment application for Latresia A. Wilson M.D., P.A., notwithstanding that the enrollment application required disclosure of, among other things, all individuals who have a five percent or greater direct or indirect ownership interest in the applicant and all managing employees of the applicant. Managing employee was defined as a general manager, business manager, administrator, director, or other individual who exercised operational or managerial control over, or who directly conducted, the day-to-day operations of the supplier, either under contract or through some other arrangement, regardless of whether the individual was a W-2 employee of the supplier.

d. It was further part of the conspiracy that Latresia Wilson and Corey Alston paid Marketing Company 1 approximately $85,000 in exchange for Medicare beneficiary identification numbers, including HICNs and MBIs, and other information, for thousands of Medicare beneficiaries throughout the United States.

e. It was further part of the conspiracy that Latresia Wilson and Corey Alston would cause over-the-counter COVID-19 tests to be shipped to those Medicare beneficiaries whose Medicare beneficiary identification numbers had been purchased, regardless of whether the Medicare beneficiaries had requested or needed the tests.

f. It was further part of the conspiracy that Latresia Wilson and Corey Alston caused Latresia A. Wilson M.D., P.A. to submit more than $8.4 million in false and fraudulent claims to Medicare for over-the-counter COVID-19

7

tests that were medically unnecessary and ineligible for reimbursement. Medicare paid more than $2.6 million based on those claims.

      g.    It was further part of the conspiracy that Latresia Wilson caused the majority of the Medicare reimbursement payments to be transferred to Corey Alston through Heritage Pharma Group, and that Latresia Wilson retained a portion of the Medicare reimbursement payments for her own use.

### E.   Overt Acts

21.    The defendants and their co-conspirators committed various overt acts in furtherance of the conspiracy, and to effect the objects thereof, in the Middle District of Florida and elsewhere. In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Middle District of Florida, at least one of the following overt acts, among others:

      a.    On or about July 1, 2022, Latresia Wilson and Corey Alston executed a memorandum of understanding between Heritage Pharma Group and Latresia A. Wilson M.D., P.A. in which Latresia A. Wilson M.D., P.A. agreed to be "in good standing, credentialed and able to bill Medicare, Medicaid and proposed insurance companies" and Heritage Pharma Group agreed to "identify customers who request or opt in to receive Covid-19 Test kits on a monthly basis."

      b.    On or about July 28, 2022, Latresia Wilson submitted or caused to be submitted a Medicare enrollment application for Latresia A. Wilson M.D., P.A. that identified Latresia Wilson as the sole owner and managing member.

8

c. On or about September 14, 2022, Latresia Wilson sent or caused to be sent a wire payment to Marketing Company 1 in the amount of $10,000 in exchange for Medicare beneficiary information.

d. On or about September 14, 2022, Latresia Wilson sent or caused to be sent a wire payment to Heritage Pharma Group in the amount of $180,261.02.

e. On or about September 16, 2022, Corey Alston sent or caused to be sent a wire payment to Marketing Company 1 in the amount of $10,000 in exchange for Medicare beneficiary information.

f. On or about September 19, 2022, Latresia Wilson sent or caused to be sent a wire payment to Heritage Pharma Group in the amount of $143,066.62.

g. On or about September 21, 2022, Latresia Wilson sent or caused to be sent a wire payment to Heritage Pharma Group in the amount of $67,373.62.

All in violation of 18 U.S.C. § 371.

# FORFEITURE

1.      The allegations contained in Count One are incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(7).

2.      Upon conviction of a conspiracy to violate 42 U.S.C. § 1320a-7b(b), in violation of 18 U.S.C. § 371, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the offense.

3.      The property to be forfeited includes, but is not limited to, the following: orders of forfeiture in the amount of proceeds each defendant obtained from the offense.

4.      If any of the property described above, as a result of any act or omission of the defendants:

       a.      cannot be located upon the exercise of due diligence;

       b.      has been transferred or sold to, or deposited with, a third party;

       c.      has been placed beyond the jurisdiction of the court;

       d.      has been substantially diminished in value; or

       e.      has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

A TRUE BILL,

███████████████

Foreperson

ROGER B. HANDBERG
United States Attorney

GLENN S. LEON
Chief
Fraud Section, Criminal Division
U.S. Department of Justice

*[signature]*

D. KEITH CLOUSER
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice

*[signature]* Ken Welsh for AUSA Michael Felicetta
Chief, Orlando Division
MDFL

11

FORM OBD-34
April 23

No.

# UNITED STATES DISTRICT COURT
## Middle District of Florida
### Ocala Division

## THE UNITED STATES OF AMERICA

vs.

## LATRESIA WILSON and COREY ALSTON

## INDICTMENT

Violations: 18 U.S.C. § 371

_____
Foreperson

Filed in open court this 12th day

of April, 2023.

_____ Clerk

Bail $_____

GPO 863 525